1
2
3
4
5
6
7
8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16
17
18

| | |
|---|---|
| OLIVIA GARCIA, Regional Director of Region 21 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD<br><br>Petitioner,<br><br>vs.<br><br>FALLBROOK HOSPITAL CORPORATION d/b/a FALLBROOK HOSPITAL,<br><br>Respondent. | CASE NO.  13CV1159-GPC(WMC)<br><br>**ORDER GRANTING PETITIONER'S MOTION FOR TEMPORARY INJUNCTION PURSUANT TO SECTION 10(j) OF THE NATIONAL LABOR RELATIONS ACT**<br><br>[Dkt. No. 2.] |

19
20
21
22
23
24
25
26
27
28

On May 16, 2013, Petitioner Olivia Garcia, Regional Director of Region 21 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board filed a petition for temporary injunction under section 10(j) of the National Labor Relations Act ("Act") along with a motion for temporary injunction. (Dkt. Nos. 1, 2.)  On May 24, 2013, Respondent Fallbrook Hospital Corporation filed an opposition. (Dkt. No. 12.)  Petitioner filed a reply on May 29, 2013. (Dkt. No. 14.) On June 5, 2013, the Court held a hearing.  (Dkt. No. 16.)  Robert Mackay, Esq. appeared on behalf of Petitioner and Robert Rosenthal, Esq. appeared on behalf of Respondent.  Based on the briefs, supporting documentation, and applicable law, the Court GRANTS Petitioner's motion for temporary injunction pursuant to Section 10(j)

1   of the National Labor Relations Act ("Act").

2   **Background**

3       Respondent operates an acute care hospital in Fallbrook, California. On May 24,

4   2012, the National Labor Relations Board ("NLRB" or "Board") issued a Certification

5   of Representation in favor of the California Nurses Association/National Nurses

6   Organizing Committee ("CNA/NNOC"), AFL-CIO, ("Union") to be representative of

7   the collective bargaining unit of registered nurses employed at Fallbrook Hospital.

8   (Resp't Opp., Ex. A.)

9       On September 26, 2012, the Union filed an unfair labor practices Charge against

10  Respondent in Case No. 21-CA-090211, which was first amended on November 8,

11  2012, and again amended on December 14, 2012. (Dkt. No. 12-6, Rosenthal Decl., Ex.

12  E.) The second amended Charge alleges that Fallbrook violated sections 8(a)(1) and

13  8(a)(5) of the Act by engaging in conditional bargaining during collective-bargaining-

14  agreement negotiations; refusing to meet and bargain with Union representatives

15  regarding Respondent's decision to terminate two unit employees; and refusing to

16  provide the Union with relevant, requested information in connection with the

17  termination.  On January 9, 2013, the Union filed an unfair labor practices Charge

18  against Respondent in Case No. 21-CA-096065, alleging violations of sections 8(a)(1)

19  and 8(a)(5) of the Act by refusing to bargain unless the Union discontinued use of the

20  Assignment Despite Objection ("ADO") forms. (Id.) On March 6, 2013, following its

21  investigation of the Charges, Region 21 of the NLRB issued Complaints in both

22  matters which were consolidated and noticed for a hearing before the administrative

23  law judge ("ALJ").  On April 8-10, 2013, a hearing was held before an ALJ of the

24  Board in San Diego. (Dkt. Nos. 2-3 to 2-12, M. For Temp. Inj., Exs. 4-6.)  On May 1,

25  2013, Fallbrook submitted a post-hearing brief. (Dkt. No. 12-8, Rosenthal Decl., Ex.

26  G.)  On May 16, 2013, Petitioner filed the petition and motion for injunction. (Dkt.

27  Nos. 1, 2.)  On the same day, the ALJ issued a decision concluding that Fallbrook

28  violated the Act as alleged by the Consolidated Complaint. (Id., Ex. C.)

    [13CV1159-GPC(WMC)]

**Discussion**

Section 10(j) of the Act provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j).  "The purpose of a § 10(j) injunction is 'to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes' an unfair labor practice complaint." Frankl v. HTH Corp., 650 F.3d 1334, 1341 (9th Cir. 2011) (quoting Miller v. Cal. Pac. Med. Ctr., 19 F.3d 449, 459–60 (9th Cir. 1994) (en banc)).

In order to obtain a § 10(j) injunction, Petitioner "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Id. at 1155 (citing Winter v. Nat. Res. Def. Council, 555 U.S. 7, 21 (2008)). "'[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable harm and that the injunction is in the public interest." Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  Petitioner "must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." Id. at 1131 (emphasis in original); see Small v. Operative Plasterers' and Cement Masons' Int'l Ass'n, Local 200, 611 F.3d 483, 491 (9th Cir. 2010) (observing that Winter abrogated Miller's holding that a mere "possibility of irreparable harm" can be adequate); McDermott v. Ambersand Pub., LLC, 593 F.3d 950, 957 (9th Cir. 2010) (same). "[T]he court must evaluate the traditional equitable criteria through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective

1    bargaining process and to preserve the Board's remedial power." Id. (citation omitted).

2        Once a complaint is filed with the Board, an ALJ holds a hearing on the

3    complaint and prepares a decision containing findings of fact, conclusions of law, and

4    recommendations as to the disposition of the case. 29 C.F.R. §§ 102.35, 102.45. The

5    ALJ's decision, however, is not final. See 29 C.F.R. § 102.45. Only the Board, after

6    either adopting or rejecting the ALJ's decision, can provide relief. 29 C.F.R. § 102.48.

7    Further, anyone aggrieved by the Board's final order can obtain review of the order in

8    a United States court of appeals. 29 U.S.C. § 160(f). During this process to reach the

9    Board's decision, in order to preserve the lawful status quo that existed before an

10   employer's unfair labor practices, Congress accorded the Board authority to seek a

11   temporary injunction pursuant to section 10(j).

12       The current unique procedural posture of this case seeks an injunction after an

13   ALJ has made a decision and prior to a decision on the merits by the NLRB. See

14   Norelli v. SFO Good-Nite Inn, No. C06-7335 MJJ, 2007 WL 662477, at *2 (N.D Cal.

15   Mar. 1, 2007) (noting that procedural posture in the case differs from many other

16   injunction cases as instead of asking for an injunction as a precursor to the ALJ's

17   decision, Petitioner seeks an injunction as a precursor to a decision on the merits by the

18   NLRB). While the Ninth Circuit has not formally determined how much weight to give

19   an ALJ's decision in a 10(j) proceeding,[1] district courts in this circuit have considered

20   this issue.

21       In its review, the court may not only consider the underlying charge and

22   supporting evidence, but may also consider relevant findings and legal determinations

23   of the ALJ. Norelli, 2007 WL 662477, at *6; see also Ahearn v. Remington Lodging

24   and Hospitality, 842 F. Supp. 2d 1186, 1196 (D. Alaska Feb. 2, 2012) (ALJ's decision

25   is not dispositive but ALJ's factual and legal determination supply a useful

---

27   [1] In Small, the Ninth Circuit did not have to decide how much weight to give an
     ALJ's decision but noted that the Seventh Circuit's reasoning in Bloedorn v. Francisco
28   Foods, Inc., 276 F.3d 270, 288 (7th Cir. 2001), stating that ALJ's determinations
     supply a useful benchmark, was compelling. Small v. Avanti Health Sys., LLC, 661
     F.3d 1180, 1186 (9th Cir. 2011).

[13CV1159-GPC(WMC)]

benchmark).   The district court does not sit in review of an ALJ's decision but should consider the ALJ's findings relevant in its determination.  <u>Norelli</u>, 2007 WL 662477, at *6.  "Assessing the likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. . . . Since the ALJ is the Board's first-level decision-maker and has presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Regional Director's prospects of success may be weighed."  <u>Id.</u> (citing <u>Bloedorn v. Francisco Foods, Inc.</u>, 276 F.3d 270, 288 (7th Cir. 2001)); <u>Silverman v. J .R.L. Food Corp.</u>, 196 F.3d 334, 337-38 (2d Cir. 1999) (per curiam); <u>Rivera-Vega v. ConAgra, Inc.</u>, 70 F.3d 153, 161 (1st Cir. 1995); <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d 33, 37 n. 7 & 40 n. 11 (2d Cir. 1975); <u>see also</u> <u>Willms v. The Guard Publishing Co.</u>, 2001 WL 34038572 at *2 (D. Or. 2001) (stating "the decision by the ALJ adds considerable weight to the probability of the Regional Director's success on the merits.")).

**A.     Likelihood of Success on the Merits**

Petitioner alleges that there is a strong likelihood that she will establish that Respondent violated sections 8(a)(1) and 8(a)(5) of the Act in the administrative proceedings.  Specifically, Petitioner contends that Respondent violated the Act by failing and refusing to bargain with the Union in good faith by engaging in conditional bargaining; failing and refusing to bargain with the Union over the termination of two employees; failing to furnish relevant information to the Union; and failing and refusing to bargain as to ADO forms.  Respondent disagrees.

Section 8(a)(1) provides that it "shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title."  29 U.S.C. § 158(a)(1).  Section 8(a)(5) states that it "shall be an unfair labor practice for an employer (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."  29 U.S.C. § 158(a)(5).  Section 159(a) provides that parties are to confer in good faith with "respect to wages, hours of employment, or

other conditions of employment." 29 U.S.C. § 159(a).

### 1. Conditional Bargaining

Petitioner alleges that Respondent has failed and refused to bargain in good faith with the Union by engaging in conditional bargaining by refusing to submit proposals and/or counter-proposals until it received all the Union's proposals. Respondent confirms this allegation but contends that after the Union provided all of its proposals, the Hospital presented the Union with fourteen new proposals at the end of November 2012. Therefore, Respondent argues that since the Hospital complied by providing their proposals, the relief Petitioner seeks is now moot.

Shortly after certification, on June 13, 2012, the Union and the Hospital had an introductory meeting.[2] The Union provided the Hospital with a preliminary information request and the parties discussed dates for bargaining. On June 25, 2012, the Union received some of the information it requested from the Hospital.

On July 3, 2012, the first bargaining session took place. The meeting began with information requests. The Union presented its initial written proposals, which totaled more than 30. Don Carmody, the Hospital attorney, stated that the Hospital would not give any proposals until the Union provided all their proposals. The Union representative replied that was bad-faith bargaining. Carmody stated that he had negotiated in this manner for 30 years.

On July 17, 2012, at the second bargaining session, Carmody started out stating that he expected all of the Union's proposals before the Hospital would offer any proposals or counter-proposals. At the meeting, the Union submitted three additional proposals, leaving only its wage proposal left to submit. The Hospital did not submit any proposals or counter proposals. On July 25, 2012, another session was held and Carmody again stated that the Hospital would not submit proposals until the Union submitted all of theirs. On August 2, 2012, the fourth bargaining session, the Hospital did not submit any new proposals or counter-proposals at the meeting. On August 22,

---

[2]The facts are excerpted from the ALJ's Findings of Facts. (Dkt. No. 9-1.)

1  2012, the Union indicated that it expected some proposals from the Hospital but

2  Carmody said the Hospital expected all of the Union's proposals before it would

3  respond.  No proposals or counter proposals were submitted at the meeting.

4    On September 12, 2012, the parties met again.  After a caucus, Carmody returned

5  and said they were done for the day and he would send an email explaining why they

6  were leaving.  No subsequent email was sent by Carmody to explain what happened.

7    On October 11, 2012, at the seventh bargaining session, Rebecca Ojala, who was

8  selected as the clinical informaticist was present as usual in her role as a member of the

9  bargaining team.  Carmody came in and without sitting down, said he would not

10  bargain because the Union had a member of management present.  The meeting lasted

11  about three minutes.  The Union subsequently emailed the last wage proposal to

12  Carmody.

13    On October 18, 2012, a meeting was held with a mediator present.  On

14  November 20, 2012, the Hospital submitted 14 proposals. On November 30, 2012, the

15  Hospital offered a proposal regarding leaves of absences and the Union submitted 10

16  counter-proposals.

17    Based on these facts, the ALJ found that Respondent's conduct of steadfastly

18  refusing over seven bargaining sessions to submit any proposals or counter-proposals

19  violated sections 8(a)(1) and (5) of the Act. (Dkt. No. 9-1 at 9-10.[3])

20    A refusal to submit counter-proposals to the union when requested is some

21  evidence of the employer's lack of good faith negotiations with the union.  <u>NLRB v.</u>

22  <u>Montgomery Ward & Co.</u>, 133 F.2d 676, 687 (9th Cir. 1943).  As explained in

23  <u>Montgomery Ward,</u>

24    the purpose of the act is to require collective bargaining to the end that
  contracts satisfactory to both employer and employees may be reached.

25    (Cases cited.) The act does not specifically require that the results of
  collective bargaining be reduced to writing, but a refusal to do what

26    reasonable and fair-minded men are ordinarily willing to do, upon
  request, may certainly be taken to be an indication of a lack of proper

27    intent and good faith in collective bargaining . . . Collective

28    [3]The page numbers are based on the ALJ's pagination in her decision.

bargaining, as contemplated by the Act, is a procedure looking toward the making of a collective agreement between the employer and the accredited representative of his employees concerning wages, hours and other conditions of employment. Collective bargaining requires that the parties involved deal with each other with an open and fair mind and sincerely endeavor to overcome obstacles or difficulties existing between the employer and the employees to the end that employment relations may be stabilized and obstruction to the free flow of commerce prevented. (Cases cited.) Mere pretended bargaining will not suffice (Cases cited.), neither must the mind be hermetically sealed against the thought of entering into an agreement. (Case cited.) To do less than is required by the decisions above cited is a refusal to bargain collectively and violates the spirit and tenor of the Act. (Case cited.)

Id. at 684. Conditional bargaining is also not permissible. Eastern Maine Medical Ctr. v. NLRB, 658 F.2d 1, 11-12 (1st Cir. 1981) (hospital's refusal to negotiate in good faith the economic issues until union accepted hospital's position on non-economic issues is a violation of section 8(a)(5)); South Shore Hosp. v. NLRB, 630 F.2d 40, 43-44 (1st Cir. 1980) (hospital's position that it is permissible to insist on piecemeal bargaining has been rejected by the Board and the courts).  Respondent violates sections 8(a)(1) and (5) of the Act by demanding written position statements from a union before agreeing to them. Ardsley Bus. Corp., Inc., 357 NLRB, No. 85, slip op. at 4 (Aug. 31, 2011).

Based on caselaw and the purpose behind collective bargaining, Respondent's refusal to submit proposals or counter proposals until the Union submitted all their proposals is an indication of bad faith bargaining.  Petitioner has demonstrated a likelihood of success that Respondent violated sections 8(a)(1) and 8(a)(5) of the Act. While the relief sought as to these specific allegations may now be  moot, Respondent seeks continued good faith negotiations and that issue is not moot.

**2.      Failure to Bargain as to Termination of Two Unit Employees**

Second, Petitioner alleges that Respondent has failed and refused to bargain with the Union regarding the terminations of two unit employees, Martha Robinson and Libby Sandwell.  Respondent argues that under the Act, employees need only bargain about wages, hours and other terms and conditions of employment, not employee

1  discipline.[4]

2      Sections 8(a)(5) and 8(d) provide that it is unlawful for an employer to refuse to

3  bargain with respect to mandatory subjects of bargaining, which includes termination

4  of employment.  See Fireboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 210 (1964)

5  ("conditions of employment" covered "termination of employment" as it necessarily

6  results from the contracting out of work performed by members of the bargaining unit);

7   N.K. Parker Transport, Inc., 332 NLRB 547, 551 (2000) (termination of employment

8  constitutes a mandatory subject of bargaining under section 8(a)(5) and 8(d) (citing

9  Ryder Distrib. Resources, 302 NLRB 76, 90 (1991)).

10      Contrary to Respondent's argument, termination of employment is a mandatory

11  subject of bargaining.  Respondent cites to Alan Ritchey, Inc. and Warehouse Union

12  Local 6, Int'l Longshore and Warehouse Union, 359 NLRB No. 40 (Dec. 14, 2012) in

13  support of its position.  As the ALJ points out, and the Court agrees, Alan Ritchey is

14  not applicable to this case because that case concerned a unilateral change allegation

15  and concerned bargaining with the union before imposing discretionary discipline.  In

16  this case, the Unit employees were already terminated in July 2012.  Petitioner assert

17  that Respondent should have bargained with the union about the effects of the

18  terminations such as severance packages, neutral recommendation letters or benefits

19  payouts.  (Dkt. No. 9-1 at 18.)

20      The ALJ concluded that the Hospital violated the Act by refusing to bargain over

21  the terminations.  Since termination is considered a mandatory subject of bargaining,

22  Petitioner has shown that it is likely to succeed on the merits on their allegation that

23  Respondent refused to bargain over the terminations of Unit employees Martha

24  Robinson and Libby Sandwell.

25  / / / /

26  _____

27      [4]Respondent also contends that it was not required to bargain over the
   termination of the two Unit employee because the Labor Relations Agreement requires
28  the parties to arbitrate employee terminations rather than collectively bargain those
   matters.  The Labor Relations Agreement is a defense raised by Respondent and is
   discussed on page 14.

### 3.      Failure to Provide Relevant Information

Petitioner also argues that it requested information in connection with one of the terminations, including a list of registered nurses in the emergency room that have been terminated in the last three years and the reasons why.  Petitioner alleges that the information is relevant to the Union's role in representing the terminated employee.  Respondent claims that it provided the Union with the requested documents for the past two years and Petitioner's request should be rendered moot.  (See Dkt. No. 12-5, Rosenthal Decl., Ex. D.)

An employer's duty to bargain collectively in good faith includes, in the absence of a valid reason that supports non-disclosure, an obligation to produce information "relevant to the union's collective bargaining duties."  Retlaw Broadcasting Co. v. NLRB, 172 F.3d 660, 669 (9th Cir. 1999) (citing NLRB v. Realty Maintenance, Inc., 723 F.2d 746, 747 (9th Cir. 1984)).  Relevancy is determined based on a "liberal, 'discovery-type standard.'" Id. (citation omitted).  "Specifically, the employer must 'supply the union, upon request, with sufficient information to enable the [union] to understand and intelligently discuss the issues raised in bargaining permitted by the collective bargaining contract.'" Id. (citing San Diego Newspaper Guild, Local No. 95 v. NLRB, 548 F.2d 863, 866 (9th Cir.1977)).  "Information pertaining to the wages, hours and working conditions of employees in the bargaining unit is so intrinsic to the core of the employer-employee relationship that it is considered presumptively relevant."  WCCO Radio, Inc. v. NLRB, 844 F.2d 511, 514 (8th Cir. 1988) (citation and internal quotation marks omitted).

The ALJ found that Respondent violated the Act by refusing to provide the information the Union requested.  The ALJ addressed but declined to give any weight to Respondent's alleged assertion that it supplied the Union with information concerning nurses terminated in the last 2 years in August 2012 because Respondent failed to offer such evidence to supports its claim. (Dkt. No. 9-1 at 16.)  Exhibit D to Rosenthal's declaration provides an email sent to the Union representative Steve

Matthews dated, August 29, 2012, concerning RN terminations for the past 2 years. (Dkt. No. 12-5.)  It attaches a list of terminated registered nurses in the past two years. It appears the reasons for termination are stated in code.  (Id.)  In its reply and at the hearing, Petitioner does not admit or deny whether this request was satisfied but argues that Respondent failed to call witnesses to testify regarding the refusal to provide information allegation during the hearing.  Moreover, the administrative record, which will be reviewed by the NLRB, does not contain this email.  The ALJ, on May 16, 2013, denied Respondent' motion to reopen the record to add this document. (Dkt. No. 14-2, MacKay Decl., Ex. A.)

While Respondent may have partially responded to Petitioner's request for information, and at the hearing stated it had substantially complied with the request and was not operating in bad faith, it appears that the request for information is not completely satisfied.  Therefore, the Court concludes that Petitioner has demonstrated a likelihood of success on the merits as to the failure to provide relevant information.

### 4.      Failure to Bargain as to ADO Forms

Petitioner argues that Respondent's abrupt announcement that the parties were at impasse and would not bargain with the Union until the Union required the Unit employees to stop using the ADO forms is evidence of bad-faith bargaining. Respondent asserts that it took this position when the Union demanded that the ADO forms be included as a bargaining issue.

In the decision, the ALJ explained the history and facts about the ADO Forms:

> The Hospital has a policy entitled "Event and Government Reporting" which ensures processes are in place to improve patient care and safety.  Per the policy, employees are instructed to fill out an on-line event report form, also referred to during the hearing as an incident report, if something noteworthy occurs on their shift. The form lists several examples of what types of incidents or events should be reported.  Employees are trained on the policy and the event reporting system during new employee orientation. Nurse Shelly Mueller (Mueller) believed the incident report was for reporting an event like a slip and fall, medication error, or a patient leaving against medical advice.  She supposed it could be used to report an unsafe working condition, but had not been instructed to use the form for this purpose.
>
> Linda Maxell (Maxwell), a registered nurse, is the risk manager,

patient advocate, and facility compliance officer at Fallbrook Hospital. She reviews every incident report and investigates each incident with the director of the department where the incident originated. Maxwell meets weekly with the chief nursing officer and the director of nursing at the skilled nursing facility to discuss each incident. Maxwell receives roughly 10-15 incident reports a week.

If a nurse believes staffing is inadequate, pursuant to Hospital policy, he or she is to raise this concern with the charge nurse and then move up the chain of command if the matter is not resolved. With regard to patient safety, nurses fill out a form of acuity each night. Nobody outside the Hospital can resolve issues relating to patient care.

The Union has created so-called "assignment despite objection" (ADO) forms upon which nurses can document assignments or situations they feel are not safe for the patient or may compromise the nurse's license. The Union provided the forms to the Respondent's nurses shortly after the election. A stack is kept at the Hospital and available for nurses' use. Matthews and fellow Union Labor Representative Glynis Golden-Ortiz trained the nurses on how to use the form in June. Before filling out the ADO form, the nurse must first verbally let her supervisor know about the issue or concern and give him/her a chance to address it. Once filled out, the nurse gives a copy of the form to his/her manager, a copy to the Union's facility bargaining committee member, and a copy to the union labor representative. There is a line on the form designated for the supervisor's response. . . . The Union did not instruct its members to fill out the ADO form instead of the Hospital's form or to fail to follow the Hospital's internal procedures for addressing patient safety concerns or incidents. Union members are not required to fill out ADO forms and there are no repercussions for failing to use them.

Maxwell noted one important feature of the Hospital's event report form is it cannot be discovered in a medical malpractice suit or by the public because it is designated as a "safety work product" designed to encourage improvements in patient safety. She does not believe the ADO form had similar protections. Maxwell also noted the ADO form lacks certain specific and pertinent information.

(Dkt. No. 9-1 at 3-4.)

The Union periodically distributes bargaining updates consisting of a page or two of highlights related to bargaining. In an October 19 bargaining update, it noted that the Union stands by its proposals, including the nurses' right to protect their licenses by use of ADO forms.

On November 1, three nurses submitted an ADO form stating they believed it was unsafe to monitor telemetry patients outside of their specific units. They gave the form to their supervisor. Nobody filled out an incident report about this issue.

[13CV1159-GPC(WMC)]

1    Maxwell, the risk manager and patient advocate, saw the completed form the first time

2    at the hearing and was concerned that it had not been brought to her attention.

3          In the November 30 bargaining update, the Union posed the question of how it

4    can get management to address the most critical issues and give acceptable counter-

5    proposals.  One answer it provided was to document patient care issues by filling out

6    ADO forms.   The December bargaining update described the ADO form, and

7    encouraged nurses to use them.  It also stated that the professional practice committee

8    will use them to raise patient care issues that need to be addressed and the bargaining

9    team will use them at the negotiating table to win important contract provisions.  The

10   January 2013 bargaining update discussed how filling ADO forms led to a change in

11   scheduling practices and noted that nurses in Barstow and Fallbrook have won

12   improvements in equipment by using ADO forms.

13         On December 28, 2012, at a bargaining session between Barstow Hospital[5] and

14   Fallbrook Hospital, Carmody informed the Union Representative that he would not

15   bargain with the Union at Barstow or Fallbrook if the nurses used the ADO forms and

16   announced they were at impasse in both places.  Union Representative Matthews stated

17   that the Union intended to use the ADO forms, but the parties were not at impasse and

18   the Union was willing to bargain over the use of the forms.  Carmody told Matthews

19   that the Hospital would not bargain with the Union unless they were willing to stop

20   using the forms, then stated they needed mediation and left the room.  Matthews sent

21   Carmody an email that same day, and again on December 31, 2012, recounting the

22   events at the session and noting the Union's willingness to negotiate with the assistance

23   of a mediator.

24         On January 8, 2013, the Hospital stated that the parties were at impasse because

25   of the Union's insistence on using the ADO forms.  Matthews disputed this claim and

26   indicated they were willing to bargain over the forms.  The hospital then said they were

27

28         [5]Barstow Hospital, like Respondent, is a subsidiary of Community Health
     Systems Profession Services Corporation ("CHS").   Barstow and Fallbrook are
     simultaneously engaged in collective bargaining agreement negotiations.

1   done and left the session.  During the bargaining sessions, neither party made any

2   proposals over the use of the ADO forms. In January 2013, Matthews sent several

3   emails to Carmody inquiring about future bargaining dates but he never received a

4   response.

5          Respondent argues that it had the right to refuse to bargain unless the Union

6   stopped using ADO forms when the Union demanded that the ADO forms be included

7   as a bargaining issue.  The Hospital objected because the ADO forms could be deemed

8   to violate HIPAA and the Patient Safety and Quality Improvement Act of 2005, 42

9   U.S.C. § 299b-21-b-26.  The ADO forms would also disclose patient information

10  which would put the Hospital's and nurses' license, and the Hospital's business at risk.

11         Contrary to Respondent's argument, Petitioner states that it has not ordered

12  employees to use these forms; there are no repercussions from the Union for not using

13  them; and the Union has not instructed employees to stop using the Hospital's internal

14  reporting system.  (Pet., Ex. 4 at 135, 148, 166.)  Moreover, the Union has not

15  advanced any proposals in the contract negotiations regarding the use of the ADO

16  forms.  (Id. at 151-156.)  The Union alleges that Respondent initially raised the issue.

17  In response, the Union stated a willingness to bargain over the issue.  (Id. at 60.)

18         After an in-depth analysis of the facts surrounding the ADO forms, the ALJ

19  concluded that Respondent's defenses concerning the use of the ADO form and the

20  Union's insistence on bargaining over patient care lack merit.  (Dkt. No. 9-1 at 13.)

21  The ALJ noted that Respondent alleges that the Union insisted on bargaining over the

22  ADO forms; however, there were no proposals or counter proposals made by either

23  parties over the use of the ADO forms.  The only way they were addressed were by

24  Respondent's refusal to bargain because of them despite the Union's willingness to

25  bargain.  (Id. at 12.)

26         As Petitioner argues, it is not necessary for the Court or the Board to determine

27  if use of the ADO forms is a mandatory or permissive subject of bargaining.  If

28  mandatory, Respondent cannot refuse to bargain.  If permissive, Respondent cannot

1  suspend the contract negotiations based on a demand that the Union order the unit

2  employees to stop using the forms.  The Court finds the ALJ's findings of fact helpful.

3  Based on these facts, the Court concludes that Petitioner has demonstrated a likelihood

4  of success on the merits that Respondent refused to bargain with the Union until it

5  required the employees to stop using the ADO forms.

6        **5.      Respondent's Arguments/Defenses**

7        In opposition, Respondent also presents its defenses arguing that Petitioner will

8  not likely succeed on the merits.

9        **a.      Labor Relations Agreement**

10        According to Respondent, prior to the Certification, Fallbrook and CNA entered

11  into an "ad hoc" oral labor relations agreement ("Agreement").  Pursuant to this

12  agreement, the parties agreed to submit any unresolved disputes to final, binding

13  arbitration.[6]  (Dkt. No. 12-3, Rosenthal Decl., Ex. B, Carmody Aff. at 2:24-3:2.)

14        In an affidavit, Carmody, the Hospital's attorney, states that the Union and

15  Community Health Systems Profession Services Corporation ("CHS") are parties to the

16  Agreement which sets forth rules for organizing, elections and negotiations for an

17  initial collective bargaining agreement.  The signatory, CHS, binds all affiliates

18  including Fallbrook Hospital to the Agreement as Fallbrook is a subsidiary of CHS.

19  The agreement has been in effect on an ad hoc basis since April 2012 and was to

20  remain in effect through, at least, December 31, 2012.  (Id. at 1.)

21        Petitioner argues that the oral ad hoc agreement is not a collective bargaining

22  agreement, not a signed agreement and Respondent has not provided any legal

23  authority where an agreement entered into prior to a Board-conducted election divests

24  _____

25        [6]On May 23, 2013, Fallbrook filed a complaint against CNA/NNOC, AFL-CIO for declaratory judgment and for a speeding hearing under Federal Rule of Civil Procedure 57.  (Case No. 13cv1233-BTM(WVG); Dkt. No. 1.)  The complaint arises

26  under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.  It seeks declaratory judgment in the form of an Order declaring that both

27  Fallbrook and CNA/NNOC agreed that disputes about the collective bargaining process or the Agreement would be submitted exclusively to an arbitrator, rather than to the

28  NLRB.  On May 31, 2013, the case was low-numbered.

[13CV1159-GPC(WMC)]

1   the Board from having exclusive jurisdiction over deciding subsequent unfair labor

2   practices charges.

3       At the hearing, the ALJ declined to consider evidence regarding the oral

4   agreement to arbitrate based on <u>Collyer Insulated Wire Co.</u>, 192 NLRB 837 (1971).

5   The ALJ explained that since there was no collective bargaining agreement between

6   the parties, it follows that there is no arbitration clause.  Moreover, the issue was only

7   raised as an affirmative defense to the first amended complaint.  Lastly, there would be

8   an expenditure of resources and time spent conducting a "mini trial" to determine

9   whether there was an ad hoc oral agreement.  If there was an agreement, the ALJ would

10  have to determine what the terms were which would depend on the parties'

11  recollections, and what precise words were uttered to make an agreement.  The ALJ

12  noted this would present significant problems and would delay adjudication of the

13  complaint.

14      The Board has wide discretion whether to defer its own proceedings until a

15  contract dispute has been resolved by the mechanism established by the parties, such

16  as arbitration.  <u>NLRB v. Max Factor and Co.</u>, 640 F.2d 197, 201 (9th Cir. 1980).  In

17  <u>Collyer</u>, the NLRB listed factors favoring deferral:

18          [t]he dispute arose within the confines of a long and productive
            collective-bargaining relationship; there was no claim of employer
19          animosity to the employees' exercise of protected rights; the parties'
            contract provided for arbitration in a very broad range of disputes; the
20          arbitration clause clearly encompassed the dispute at issue; the
            employer had asserted its willingness to utilize arbitration to resolve
21          the dispute; and the dispute was eminently well suited to resolution by
            arbitration.
22

23  <u>United Techs. Corp.</u>, 268 NLRB 557, 558 (1984) (citing <u>Collyer Insulated Wire, Gulf</u>

24  <u>& Western Sys. Co.</u>, 192 NLRB 837 (1971)).  The <u>Collyer</u> line of reasoning has been

25  adopted by the courts of appeals and favorably commented by the United States

26  Supreme Court.  <u>Id.</u> (citing <u>Arnold Co. v. Carpenters</u>, 417 U.S. 12, 16-17 (1974)).

27      Here, as the ALJ explained and after the Court's review, all the factors weigh

28  against deferral of the case to arbitration particularly since there is no collective

bargaining agreement.  Respondent's argument that the matter should be in arbitration is without merit.

### b.   CNA's Affiliation with NUHW

Respondent argues that Petitioner is unlikely to succeed on the merits because CNA's affiliation with the National Union of Healthcare Workers ("NUHW") and its attendant financial obligation has resulted in a discontinuity of representation which relieved Fallbrook of any duty to bargain.  Petitioner opposes.

Six months after issuance of the Certification, in November 2012, CNA negotiated an affiliation agreement with the NUHW.  The affiliation became effective on January 1, 2013.

Respondent has the burden to show the lack of continuity of representation. Sullivan Bros. Printers, 317 NLRB 561, 562 (1995) (overruled on other grounds by Raymond F. Kravis Ctr. for Performing Arts, Inc. v. NLRB, 559 F.3d 1183 (D.C. Cir. 2008)).  To determine whether there is a lack of continuity of representation after an affiliation, the Board considers whether the merger or affiliation resulted in a change that is "sufficiently dramatic" to alter the union's identity.  May Department Stores, 289 NLRB 661, 665 (1988), enfd. 897 F.2d 221 (7th Cir. 1990).  This may occur where "the changes are so great that a new organization comes into being—one that should be required to establish its status as a bargaining representative through the same means that any labor organization is required to use in the first instance."  Western Commercial Transport, Inc., 288 NLRB 241, 217 (1988).  The Board considers the totality of the circumstances in determining continuity.  Mike Basil Chevrolet, 331 NLRB 1044 (2000); Raymond F. Kravis Ctr. for the Performing Arts v. NLRB, 351 NLRB 143,  enf'd 550 F.3d 1183 (D.C. Cir. 2008).  Factors to consider to determine if there is a continuity of representation are:

> continued leadership responsibilities by the existing union officials; the perpetuation of membership rights and duties, such as eligibility for membership, qualification to hold office, oversight of executive council activity, the dues/fees structure, authority to change provisions in the governing documents, the frequency of membership meetings, the continuation of the manner in which contract negotiations,

1
2

administration, and grievance processing are effectuated; and the
preservation of the certified union's physical facilities, books, and
assets

3
4

Western Commercial Transport, 288 NLRB 214, 217 (1988).

5
6
7
8
9
10
11
12
13
14

Without any legal support, Respondent argues that CNA's loan to NUHW of $1 million to $1.2 million per month in January 2013 and lack of any documents setting forth the terms of the loan demonstrate a lack of continuity of representation. Respondent argues that this gives rise to a serious question whether the financial commitments of the CNA to its members has changed to such a degree that it constitutes discontinuity of representation. Also, CNA's obligation for NUHW's debts could seriously interfere with CNA's obligations regarding service and benefits to its registered nurse units.  It argues that depletion of CNA resources is a factor which changes the character of the organization.  In response, Petitioner defers to the ALJ's ruling on this issue.

15
16
17
18

The ALJ provided a detailed analysis of this issue.  Her findings of fact show the affiliation with NUHW has changed nothing with regard to the Union's leadership, the manner in which it represents its members or its day-to-day operations.  The Union operates as an autonomous entity before and after the affiliation.

19
20
21
22
23

As to $1 million and $1.2 million monthly loan between January and April 2013 to supports its campaign to organize the nurses at Kaiser Permanente, the ALJ concluded the loan did not change the identify of the CNA.  The ALJ noted that there was no evidence to show that the union members are not being represented at the same level as before the affiliation.

24
25
26

The Court finds the ALJ's findings of fact persuasive on this issue.  Accordingly, the Court concludes that CNA's affiliation with the NUHW has not resulted in a discontinuity of representation.

27
28

### c.      Lack of NLRB Quorum and Regional Director's Lack of Authority

Respondent asserts that the lack of a constitutionally appointed NLRB quorum

1   invalidates the Certification issued on May 24, 2012. Moreover, it argues that the

2   Regional Director does not have authority to file the 10(j) petition because he acts on

3   behalf to the Board, which cannot proceed as the Board did not have a quorum.

4   Petitioner argues that Respondent waived its challenge as to the validity of the

5   Certification because Respondent entered into a Consent Election Agreement and did

6   not challenge the appropriateness of the Union at the time.  In fact, Respondent

7   recognized and began to meet and bargain with the Union.

8        The Board must maintain a quorum of at least three members in order to have

9   authority to act.  29 U.S.C. § 153(b).  In Noel Canning v. NLRB, 705 F.3d 490, 509

10  (D.C. Cir. Jan. 25, 2013), the court invalidated President's Obama's January 4, 2012

11  recess appointments of Sharon Block, Terence F. Flynn and Richard F. Griffin to the

12  Board.  Noel Canning, 705 F. 3d at 509.  Therefore, the Board was only left with two

13  members which could not satisfy the quorum requirements of Section 3(b) of the Act.

14  Respondent contends that the Certification previously issued by the Board, on May 24,

15  2012, is invalid and the Regional Director lacks any basis to  request that Fallbrook be

16  compelled to bargain with the Union.

17       The ALJ noted that a post-Noel Canning NLRB decision has rejected the

18  holding in Noel Canning.  See Belgrove Post Acute Care Center, 359 NLRB No. 77,

19  slip op. at fn. 1 (Mar. 13, 2013).  In Belgrove, the Board acknowledged that Noel

20  Canning concluded that the President's recess appointments were not valid; however,

21  as the court in Noel Canning acknowledged, its decision conflicts with rulings of at

22  least three other courts of appeals, including the Ninth Circuit.  Id. (citing U.S. v.

23  Woodley, 751 F.2d 1008, 1012-13 (9th Cir. 1985) (recognizing the President's power

24  to fill all vacancies that exist during a recess of the Senate)).  In Belgrove, the court

25  stated that since the question remains in litigation and pending a definitive resolution,

26  "the Board is charged to fulfill its responsibilities under the Act."  Id.  Thereafter, the

27  Board proceeded to rule on the case.

28       Moreover, Petitioner argues that Respondent has waived its challenge as to the

1  validity of the Certification.  "An employer who fails to follow this procedural course

2  waives the right to contest certification. That is, in order to challenge the propriety of

3  a certification, an employer must refuse to recognize a union immediately after the

4  collective bargaining unit has been certified and the union has been elected as the

5  representative for the bargaining unit. Once an employer honors a certification and

6  recognizes a union by entering into negotiations with it, the employer has waived the

7  objection that the certification is invalid." <u>Technicolor Gov't Servs. v. NLRB</u>, 739

8  F.2d 323, 327 (8th Cir. 1984) (holding employer waived right to challenge Board's

9  certification as Company entered into negotiations with Union following election and

10 certification and challenged certification only as a collateral defense to an unrelated

11 unfair labor practice charge) (citing <u>King Radio Corp. v. NLRB</u>, 398 F.2d 14, 20 (10th

12 Cir. 1968); <u>NLRB v. Blades Mfg. Corp.</u>, 344 F.2d 998, 1005 (8th Cir. 1965)).

13    Here, Respondent did not object to the Certification and entered into

14 negotiations with the Union following the election and certification. Accordingly,

15 Respondent has waived its challenge to the Certification.

16    Petitioner further argues that the 10(j) petition was separately authorized by the

17 Acting General Counsel, on April 3, 2013, under a delegation of litigation authority

18 that is effective in the event the Board lacks a quorum.  (Dkt. No. 14-2, MacKay Decl.,

19 Ex. C); <u>see also</u> Order Contingently Delegating Authority to the General Counsel, 76

20 FR 69768092, 2011 WL 5357994 (Fed. Reg.) (Nov. 9, 2011) ("SUMMARY: The

21 National Labor Relations Board has issued an Order contingently delegating to the

22 General Counsel full authority over court litigation matters that otherwise would

23 require Board authorization and full authority to certify the results of any secret ballot

24 election conducted under the National Emergency provisions of the Labor Management

25 Relations Act, sections 206-210, 29 U.S.C. §§ 176-180. These delegations shall

26 become effective during any time at which the Board has fewer than three Members

27 and shall cease to be effective whenever the Board has at least three Members.")

28    Accordingly, Respondent failed to show that the Board's alleged lack of a

quorum deprived it of its authority to file the 10(j) petition and that it and the Regional Director did not have authority to institute these proceedings.

In sum, the Court concludes the Petitioner has demonstrated a likelihood of success on the merits that Respondent has violated sections 8(a)(1) and 8(a)(5) of the Act.

**B.   Irreparable Harm**

Petitioner asserts that Respondent's conduct makes the Union appear ineffective and frustrates employees' support for the Union and prevents employees from enjoying the benefits of Union representation.   According to Petitioner, Union meeting attendance has decreased and attendance at meetings for the Union's internal bargaining committee decreased so much that the Union has abandoned those meetings. In addition, few employees have supported the Union's effort to sign petitions or wear buttons and employees have indicated they are fearful to be identified with the Union. Lastly, Petitioner contends that since there is no collective bargaining agreement, employees' ties to the union are fragile and susceptible to employer unfair labor practice.   Respondent argues that there is no irreparable harm as it delayed filing the petition until May 2012 when it could have filed the petition when the alleged unfair practices began in July 2012 or after December 28, 2012, the last bargaining session.

The Ninth Circuit has repeatedly held that "permitting an alleged unfair labor practice to reach fruition and thereby rendering meaningless the Board's remedial authority is irreparable harm." Small v. Avanti Health Sys., LLC, 661 F.3d 1180, 1191 (9th Cir. 2011).   "[W]hile a district court may not presume irreparable injury with regard to likely unfair labor practices generally, irreparable injury is established if a likely unfair labor practice is shown along with a present or impending deleterious effect of the likely unfair labor practice that would likely not be cured by later relief." Frankl, 650 F.3d at 1362.

Delay in filing a petition is not dispositive in determining whether to grant injunctive relief.   Hirsch v. Dorsey Trailers, Inc., 147 F.3d 243, 248-49 (3d Cir. 1998).

[13CV1159-GPC(WMC)]

The Board needs time to investigate and deliberate before determining whether to bring a section 10(j) action. Aguayo v. Tomco Carburetor Co., 853 F.2d 744, 750 (9th Cir. 1988) (delay is only significant if the harm has occurred and the parties cannot be returned to the status quo; the Board needs a reasonable period of time to investigate and deliberate before it decides to bring a section 10(j) action) (overruled on other grounds by Miller v. California Pacific Med. Ctr., 19 F.3d 449, 457 (9th Cir. 1994)). Moreover, a delay by awaiting an ALJ's decision may assist the process by providing the district court with the benefit of a developed record and the ALJ's legal analysis. Ahearn ex rel. NLRB v. Remington Lodging and Hospitality, 842 F. Supp. 2d 1186, 1204 (D. Alaska Feb. 2, 2012) (citing Frankl, 650 F.3d at 1363). Respondent relies on McDermott v. Ampersand Publ'g, LLC, 593 F.3d 950 (9th Cir. 2010), where the Court affirmed a district court's decision denying a 10(j) petition noting that the regional director did not seek relief until 13 to 17 months after the alleged unfair labor practices took place. However, the following year, the Ninth Circuit affirmed two district court cases granting 10(j) petition despite similar (or longer) delays. See Small, 661 F.3d at 1195 n. 20; Frankl, 650 F.3d at 1363. In comparing these decisions, a district court observed the following:

> One significant distinguishing factor, however, is that in Ampersand, the district court denied the petition, while in the latter two cases, the district courts had granted the petitions. This makes sense given that the courts of appeals review district court decisions on § 10(j) petitions for abuse of discretion. Additionally, Avanti and Frankl both involved an employer's failure to bargain good faith, which the court found was more susceptible to an immediate remedy than retroactive relief from the Board, while Ampersand primarily involved a dispute over the reinstatement of employees. Thus, in circumstances similar to the present case, even a three year delay may be permissible where the ULP can be remedied in such a manner that could not be achieved retroactively by the Board's order.

Ahearn, 842 F. Supp. 2d at 1203-04. Here, attendance at meetings has decreased dramatically, the internal bargaining committee has ceased completely, and support for the Union has declined. It appears that the Hospitals failure to bargain in good faith has negatively impacted the Union. As time passes, more harm will ensue.

1   Accordingly, the Court concludes that irreparable harms is likely absent an injunction.

2   **C.    Balance of Hardships**

3   Petitioner argues that the balance of hardships favors granting interim relief as
4   the interim bargaining order would be temporary and would only require the
5   Respondent to do what it is required to do under the Act.  The interim bargaining order
6   would restore the *status quo* and require Respondent to bargain with the Union in good
7   faith to an agreement or a bona fide impasse.  Respondent argues that it will be
8   deprived of the benefit of its bargain with the CNA to arbitrate the issues in this case.
9   It also contends that if Fallbrook is forced to bargain over the issues of ADO forms, its
10  license and professional licenses of its employees will be at substantial risk.

11  "[I]n considering the balance of hardships, the district court must take into
12  account the probability that declining to issue the injunction will permit the alleged[
13  ] unfair labor practices to reach fruition and thereby render meaningless the Board's
14  remedial authority." Frankl, 650 F.3d at 1365 (quoting Miller, 19 F.3d at 460).  The
15  court's determination that Petitioner has shown likely irreparable harm means that the
16  balance of hardship tips to its side.  See id.  Based on the facts of this case, the balance
17  of hardship weighs in favor of Petitioner.

18  **D.    Public Interest**

19  Petitioner maintains that the public interest supports an injunction.  Respondent
20  contends that there is a strong public interest in forcing the parties to live up to their
21  contractual obligations and arbitrate their disputes, and in protecting the integrity of
22  Fallbrook's license and the professional licenses of its nurses.  Also, it contends there
23  is a public interest in protecting patient confidentiality and protecting patient care and
24  safety if ADO forms are subject to bargaining.

25  "In § 10(j) cases, the public interest is to ensure that an unfair labor practice will
26  not succeed because the Board takes too long to investigate and adjudicate the charge."
27  Frankl, 650 F.3d at 1366.  "The task of the Board in devising a final remedy is 'to take
28  measures designed to recreate the conditions and relationships that would have been

had there been no unfair labor practice.'" <u>Franks v. Bowman Transp. Co.</u>, 424 U.S. 747, 769 (1976) (internal quotation marks omitted). The most effective way to protect the Board's ability to recreate the relationship and restore the status quo is for the court itself to order a return to the status quo. <u>Frankl</u>, 650 F.3d at 1366.

Accordingly, the Court concludes that there is a public interest in making sure the unfair labor practices demonstrated do not succeed. This supports the grant of a 10(j) injunction.

**E.     Request for Evidentiary Hearing**

Respondent requests discovery and an evidentiary hearing in the event the Court grants the injunction. Petitioner opposes arguing that a trial has already been conducted by the ALJ and the merits of the case will be decided by the Board based on that record. In its request, Respondent provides no basis for seeking discovery or an evidentiary hearing. Respondent does not state what discovery it seeks and why it seeks an evidentiary hearing. Accordingly, the Court DENIES Respondent's request for discovery and an evidentiary hearing.

**Conclusion**

Based on the above, the Court GRANTS Petitioner's motion for temporary injunction pursuant to Section 10(j) of the National Labor Relations Act.

IT IS SO ORDERED.

DATED: June 7, 2013

HON. GONZALO P. CURIEL
United States District Judge